UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
MARK NOVECK,

            Plaintiff,

       - against -

PV HOLDINGS CORPORATION; AESOP LEASING,
L.P.; CENDANT CAR RENTAL GROUP; and AVIS
RENT-A-CAR SYSTEM, LLC.,

            Defendants.
-----------------------------------------------------------------X
PV HOLDINGS CORPORATION; AESOP LEASING,
L.P.; CENDANT CAR RENTAL GROUP; and AVIS
RENT-A-CAR SYSTEM, LLC.,

            Cross Claimant,

       - against -

GENERAL MOTORS CORPORATION,

            Cross Defendant.
-----------------------------------------------------------------X

**MEMORANDUM & ORDER**
07-CV-2948(RRM) (RML)

**MAUSKOPF, United States District Judge.**

    Plaintiff, Mark Noveck, brings this diversity action against PV Holdings Corporation,

Aesop Leasing L.P., Cendant Car Rental Group, and Avis Rent-A-Car System, LLC (collectively,

"Avis"), following a catastrophic automobile accident which left him paralyzed from the neck

down. The gravamen of Plaintiff's complaint is that the vehicle which Avis leased him was

defectively designed because it was not equipped with a side curtain airbag. Plaintiff alleges

strict liability in tort, negligence, and breach of express and implied warranties. Avis moves for

partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1]  For the reasons that follow, Avis' motion is GRANTED.

## FACTUAL BACKGROUND

The Accident

On May 21, 2005, Plaintiff, Mark Noveck, rented a 2005 Chevrolet Trailblazer ("Trailblazer") from the Avis Rent-A-Car facility at La Guardia Airport.  This vehicle was not equipped with an optional side curtain airbag.  Plaintiff claims that the Avis employee behind the counter informed him that the Trailblazer was safe, and that a second Avis employee showed him how to use the vehicle and went over its safety features, including the seatbelt, airbag, and brakes.  Pl. Dep. at 101.  Plaintiff testified that "[i]f the person told me it was not a safe car to drive, I would have gotten a sedan."  Pl. Dep. at 59.

Upon completing the rental transaction, Plaintiff, along with his sister-in-law, Luiza Ustayeva, and her husband, Vladimir Sachakov, embarked on a road trip to Texas.  Plaintiff drove, Sachakov sat in the front passenger seat, and Ustayeva sat in the back.  At approximately 3:30 p.m. while traveling along Interstate 81 in West Virginia, the Trailblazer went off the road and crashed.

The circumstances surrounding the accident are unclear.[2]  Plaintiff has no recollection of the accident, and Ustayeva only recalls moving from one lane into another and a sharp U-turn.

---

[1] Avis did not move for summary judgment with respect to Plaintiff's breach of express and implied warranty claims.

[2] The parties dispute whether Plaintiff was wearing his seatbelt or speeding at the time of the accident. Plaintiff testified that at some point during the trip, he remembers seeing a blinking light on the speedometer which may have displayed a seatbelt sign, and that in response, he unfastened and then refastened his seatbelt. Ustayeva testified that Plaintiff wore his seatbelt the entire trip and that he was not speeding. However, Sachakov testified that Plaintiff was not wearing his seatbelt at the time of the accident, and the "Sensing and Diagnostic Module," a component inside the Trailblazer which records and contains pre-crash data, indicated that Plaintiff was both speeding and unbelted at the time of the accident.

Sachakov provides a more detailed account of the accident. He testified that immediately prior to the accident, Plaintiff tried to call his wife on his cell phone and that when he could not get through, he asked Sachakov to dial the number for him. Sachakov stated that he turned around to ask Ustayeva for the number but that Ustayeva had already begun dialing the number from her phone. Sachakov testified that while Ustayeva was dialing the number, she saw in the mirror that Plaintiff had fallen asleep and called his name. Sachakov further testified that when Plaintiff opened his eyes, the car was already careening off the road. Plaintiff tried to correct the vehicle but it slid onto the shoulder and rolled over, ejecting Plaintiff from the driver's side window. Sometime during the rollover, Plaintiff injured his spinal cord, leaving him paralyzed from the neck down.

Acquisition of 2005 Trailblazer

The Trailblazer that Mark Noveck had been driving was previously acquired by Avis from General Motors Corporation ("GM") through a Repurchase Agreement in 2004. Pursuant to the Repurchase Agreement, Avis acquired a total of 234,700 vehicles, including 20,300 Trailblazers, for the 2005 model year. The Repurchase Agreement provided that Avis would possess these vehicles for a specified period and then return the vehicles to GM, which would bear the "residual risk" of the vehicle, meaning the value of the vehicle when sold or disposed. According to Avis, its custom and practice was "to rely upon GM to determine what optional safety equipment, if any, should be included with the vehicle." Def. Ex. M. It states that its considerations were "minimal and almost nonexistent beyond GM's requirements." Def. Ex. L at 65. Plaintiff contends generally, and Avis does not dispute, that Avis had available GM's Order Guide to determine the available options on the various GM models under consideration for purchase and could select additional options, but cites to no evidence regarding the options it

3

specifically considered with respect to its purchase of the 2005 Trailblazer. Pl. Ex. J at pp. 10-12, 17-18. As discussed more fully below, in support of his claim that Avis knew or should of have known that the 2005 Trailblazer had a high incidence of rollovers and thus should have been equipped with optional side airbag curtains, Plaintiff proffers the affidavits of two expert witnesses, a 2001 Daily News article and a 2001 government report regarding earlier models of the Trailblazer. *See, infra* at p. 20.

## PROCEDURAL BACKGROUND

On May 17, 2007, Mark and Irina Noveck, his wife at the time, initiated this action in the Supreme Court of New York, Queens County against GM and Avis. The action was timely removed to this Court on July 20, 2007. On September 10, 2007, Plaintiffs filed an Amended Complaint alleging negligence in the design, manufacture, ownership and/or maintenance of the vehicle; breach of express and implied warranties; strictly liability in tort for the manufacture, sale, inspection, rental and/or distribution of a defective product; and loss of consortium.[3] Both GM and Avis answered the Amended Complaint. Avis' answer asserted cross-claims against GM for indemnification should it be found liable.

On April 24, 2009, Plaintiff and GM entered into a Settlement Agreement, and thereafter, on May 8, 2009, Plaintiff filed a stipulation discontinuing all claims against GM. Consequently, on June 5, 2009, Avis amended its Answer to assert an affirmative defense pursuant to the New York General Obligations Law pertaining to settling defendants.[4] Avis now moves for partial summary judgment. Plaintiff has opposed the motion.

---

[3] On November 17, 2008, Irina Noveck discontinued her claims against Defendants. Therefore, Plaintiff's loss of consortium claim is dismissed.

[4] New York General Obligations Law § 15-108 provides, in part, "[w]hen a release or a covenant not to sue or not to enforce a judgment is given to one of two or more persons liable or claimed to be liable in tort for the same injury, or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms expressly so provide, but it reduces the claim of the releasor against the other tortfeasors to the

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed" and the court must draw all "justifiable" or "reasonable" inferences in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)); *Brosseau v. Haugen*, 543 U.S. 194, 195 n.1 (2004). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*,'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an

---

extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages under article fourteen of the civil practice law and rules, whichever is the greatest."

element essential to [its] case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting

*Celotex*, 477 U.S. at 322) (internal quotation marks omitted) (alteration in original). Thus, "[a]

defendant moving for summary judgment must prevail if the plaintiff fails to come forward with

enough evidence to create a genuine factual issue to be tried with respect to an element essential

to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247-

48).

## DISCUSSION

## I.   Federal Preemption

Avis argues that Plaintiff's strict liability and negligence claims must be dismissed

because they are preempted by federal law.  The doctrine of federal preemption is rooted in the

Supremacy Clause of the United States Constitution, which provides that "the Laws of the

United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be

bound thereby, any Thing in the Constitution or Laws of any State to the Contrary

notwithstanding." U.S. CONST. art. VI, cl. 2.  "Federal preemption of a state statute can be

express or implied, and generally occurs: [1] where Congress has expressly preempted state law,

[2] where Congress has legislated so comprehensively that federal law occupies an entire field of

regulation and leaves no room for state law, or [3] where federal law conflicts with state law."

*Pacific Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 351 (2d Cir. 2008) (citing *SPGGC, LLC

v. Blumenthal*, 505 F.3d 183, 188 (2d Cir. 2007)).

In this case, the Court must determine whether a state law finding in Plaintiff's favor

would conflict with federal law.  "Conflict preemption can arise in one of two ways, either 'when

compliance with both federal and state regulations is a physical impossibility' or 'when state law

stands as an obstacle to the accomplishment and execution of the full purposes and objectives of

Congress.'" *O'Hara v. General Motors Corp.*, 508 F.3d 753, 759 (5th Cir. 2007) (quoting *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982)).

Pursuant to the National Traffic and Motor Vehicle Safety Act of 1966 (the "Safety Act"), 49 U.S.C. § 30101, *et seq.*, the Department of Transportation ("DOT") promulgated Federal Motor Vehicle Safety Standard ("FMVSS") 208, which specifies performance requirements for the protection of vehicle occupants in crashes in order to reduce the number of deaths of vehicle occupants and the severity of injuries by specifying vehicle crashworthiness requirements. 49 C.F.R. § 571.208. FMVSS 208 applies to passenger cars, multipurpose passenger vehicles, trucks and buses, and its provisions vary based on the type of vehicle and year of manufacture.

The Safety Act contains both a preemption provision and a savings clause preserving common law liability. Its preemption clause provides:

> When a motor vehicle safety standard is in effect under this chapter, a State or a political subdivision of a State may prescribe or continue in effect a standard applicable to the same aspect of performance of a motor vehicle or motor vehicle equipment only if the standard is identical to the standard prescribed under this chapter. However, the United States Government, a State, or a political subdivision of a State may prescribe a standard for a motor vehicle or motor vehicle equipment obtained for its own use that imposes a higher performance requirement than that required by the otherwise applicable standard under this chapter.

49 U.S.C. § 30103(b)(1). The savings clause, which preserves those actions that seek to establish a greater safety than the minimum safety set forth by federal regulations, states: "[c]ompliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law." 49 U.S.C. § 30103(e).

The Supreme Court examined the preemptive effect of the Safety Act in *Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000). In that case, petitioner, who was seriously injured when her 1987 Honda Accord collided with a tree, and her parents, sued the manufacturer of the

vehicle claiming that the car had been defectively and negligently designed in that it was not equipped with a driver's side airbag. The Supreme Court concluded that (1) the Safety Act did not expressly preempt petitioners' action; (2) the savings clause did not bar ordinary preemption principles; and (3) petitioners' action actually conflicted with FMVSS 208 and was therefore preempted.

The Supreme Court's holding in *Geier* turned on FMVSS 208's specific performance requirements for passive restraint devices, which allowed "manufacturers to choose among different passive restraint mechanisms, such as airbags, automatic belts, or other passive restraint technologies to satisfy that requirement." *Geier*, 529 U.S. at 878. The Supreme Court reasoned that

> petitioners' tort action depends upon its claim that manufacturers had a duty to install an airbag when they manufactured the 1987 Honda Accord. Such a state law -- *i.e.*, a rule of state tort law imposing such a duty --by its terms would have required manufacturers of all similar cars to install airbags rather than other passive restraint systems, such as automatic belts or passive interiors. It thereby would have presented an obstacle to the variety and mix of devices that the federal regulation sought. It would have required all manufacturers to have installed airbags in respect to the entire District-of-Columbia-related portion of their 1987 new car fleet, even though FMVSS 208 at that time required only that 10% of a manufacturer's nationwide fleet be equipped with any passive restraint device at all. It thereby also would have stood as an obstacle to the gradual passive restraint phase-in that the federal regulation deliberately imposed. In addition, it could have made less likely the adoption of a state mandatory buckle-up law. Because the rule of law for which petitioners contend would have stood as an obstacle to the accomplishment and execution of the important means-related federal objectives that we have just discussed, it is pre-empted.

*Geier*, 529 U.S. at 881 (internal quotations omitted).

Numerous federal and state courts have followed the reasoning in *Geier*. *See, e.g.*, *Ellison v. Ford Motor Co.*, 650 F. Supp. 2d 1298 (N.D. Ga. 2009) (plaintiff's design defect claim seeking side impact airbags would "foreclose the option specifically allowed by FMVSS 208"); *Chase v. Ford Motor Co.*, No. 1168886 (Cal. Super. May 2, 2008); *Carden v. General Motors*

*Corp.*, 509 F.3d 227 (5th Cir. 2007) (plaintiffs' claim would "foreclose a deliberate option left to manufacturers under Standard 208"); *Osman v. Ford Motor Co.*, 359 Ill. App.3d 367 (Ill.App. 4 Dist. 2005) (same); *Heinricher v. Volvo Car Corp.*, 61 Mass. App. Ct. 313 (Mass.App.Ct. 2004); *Anthony v. Abbott*, 289 F. Supp. 2d 667 (D. Vi. 2003); *Griffith v. General Motors Corp.*, 303 F.3d 1276 (11th Cir. 2002). Plaintiff asks this Court to follow this line of cases; however, a close review of these cases reveals several distinguishing features which undermine a finding of preemption.

In reaching this conclusion, the Court is persuaded by the reasoning set forth in *Durham v. County of Maui*, No. 08-00342, 2010 WL 520706 (D. Hawai'i Feb. 12, 2010). In that case, plaintiffs brought suit against Ford Motor Company following a fatal car accident alleging that the subject vehicle was defective in that it lacked side airbags. The court, in holding that plaintiffs' state law claims were not preempted, stated that "FMVSS 208 does not conflict with Plaintiffs' side-impact airbag claims because FMVSS 208 contains no side-impact airbag requirements, much less conflicting ones." *Durham*, 2010 WL 520706 at * 8. The court also noted that unlike the vehicle in *Geier* and other cases in which the court found preemption, *see, e.g.*, *Ellison*, *Anthony*, and *Chase*, the subject vehicle fell under a subsection of FMVSS 208 which did not provide the manufacturer with options to comply with FMVSS 208's regulatory scheme. *Durham*, 2010 WL 520706 at * 11 (stating "[u]nlike the provision of FMVSS 208 applicable to the subject vehicle -- *i.e.,* subsection S4.1, which provides no options -- subsection S4.2 includes a list of explicit options that allow manufacturers to select how they will satisfy the regulatory requirements.").

Likewise, in this action, the subject vehicle, a 2005 Chevrolet Trailblazer, is governed by a subsection of FMVSS 208 which does not provide for optional passive restraint devices.[5] In fact, the "phase-in" period for optional restraints under FMVSS 208, specifically for frontal airbags, which was central to the Supreme Court's decision in *Geier*, was phased out in the 1990s, well before the 2005 Trailblazer was manufactured. *See* 49 U.S.C. § 30127(b). As the *Durham* court noted, FMVSS does not include a side curtain airbag requirement or option; consequently, FMVSS 208's regulatory scheme originally aimed at achieving a "variety and mix" of passive restraint devices would not be undermined if a state law side curtain airbag requirement was imposed. *See Soto v. Nguyen*, 634 F. Supp. 2d 1096 (E.D. Cal. 2009) (no preemption where FMVSS 208 did not address need for bus passenger seat belts). To the contrary, allowing Plaintiff's claims to proceed would likely "advance—not thwart" the statutory and regulatory purpose of the Safety Act and FMVSS 208. *See Durham*, 2010 WL 520706 at *8.

Avis also argues that Plaintiff's tort claims are preempted because they conflict with the Safety Act's regulatory framework and Congress' directive that the Secretary of the DOT promulgate national performance standards aimed at preventing ejections in rollover crashes. In support, Avis references 49 U.S.C. § 30128, which provides that "[t]he Secretary shall . . . initiate a rulemaking proceeding to establish performance standards to reduce complete and partial ejections of vehicle occupants from outboard seating positions." 49 U.S.C. § 30128(c). Avis also cites a notice issued by the National Highway Traffic Safety Administration ("NHTSA") in

---

[5] The 2005 Trailblazer is governed by FMVSS 208 subsection S4.2.6.2, which states, "Each truck, bus, or multipurpose vehicle with a GVWR of 8,500 pounds or less and an unloaded vehicle weight of 5,500 pounds or less manufactured on or after September 1, 1998 shall comply with the requirement of S4.1.5.1(a)(1) by means of an inflatable restraint system at the driver's and right front passenger's position." 49 C.F.R. § 571.S4.2.6.2. 49 C.F.R. § 571.208.S4.1.5.1(a)(1) states that passenger cars manufactured on or after September 1, 1996 shall "[a]t each front outboard designated seating position meet the frontal crash protection requirements of S5.1 by means that require no action by vehicle occupants," where S5.1 sets forth the crash protection requirements for the 50th percentile adult male dummy.

connection with amending window glazing performance requirements under FMVSS 205 which states, in part,

> with the advent of other ejection mitigation systems, particularly side air bag curtains, the agency will continue to explore the feasibility of ejection mitigation. The focus will shift from advanced glazing to consideration of more comprehensive, performance-based test procedures. If such procedures are feasible, NHTSA will focus its efforts on establishing safety performance requirements for ejection mitigation that will allow vehicle manufacturers the discretion to choose any technology that fulfills the requirements."[6]

67 Fed. Reg. 41365 (2002). However, this agency statement of policy, which does not expressly dictate performance standards, is insufficient on its face to demonstrate conflict preemption. *See O'Hara v. General Motors Corp.*, 508 F.3d 753, 761 ("agency statements of policy which do not interpret regulations have only persuasive authority") (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Moreover, even assuming that the DOT will establish national performance standards in the *future*, the statutory and regulatory framework that existed in 2005 neither mandated side curtain airbags nor provided an option to forego the use of a side curtain airbag. *See Carden*, 509 F.3d at 232 n.1 (5th Cir. 2007) (examining the version of FMVSS 208 existing at the time the subject vehicle was manufactured).

Finally, Avis argues that a finding in Plaintiff's favor would conflict with NHTSA's recent amendment to FMVSS 214, which provides:

> NHTSA is upgrading FMVSS No. 214 by requiring all passenger vehicles . . . to protect front seat occupants in a vehicle-to-pole test simulating a vehicle crashing sideways into narrow fixed objects like utility poles and trees. By doing so it

---

[6] The regulation summary provides: "This notice terminates rulemaking in which the agency was considering advanced glazing regulatory requirements for passenger cars and other light vehicles to reduce the risk of ejections in crashes. The agency's research and rulemaking efforts indicate that it is more appropriate for the agency to devote its research and rulemaking efforts to projects other than ejection mitigation through advanced glazing. However, with the advent of other ejection mitigation systems, particularly side air bag curtains, the agency will continue to explore the feasibility of ejection mitigation. The focus will shift from advanced glazing to consideration of more comprehensive, performance-based test procedures. If such procedures are feasible, NHTSA will focus its efforts on establishing safety performance requirements for ejection mitigation that will allow vehicle manufacturers the discretion to choose any technology that fulfills the requirements." 67 Fed. Reg. 41365 (2002).

requires vehicle manufacturers to assure head and improved chest protection in side crashes for a wide range of occupant sizes and over a broad range of seating positions. It will ensure the installation of new technologies, such as side curtain air bags and torso side air bags, which are capable of improving head and thorax protection to occupants of vehicles that crash into poles and trees and of vehicles that are laterally struck by a higher-riding vehicle. The side air bag systems installed to meet the requirements of this final rule will also reduce fatalities and injuries caused by partial ejections through side windows."

72 Fed. Reg. 51908 (2007). However, FMVSS 214 governs performance requirements for occupants in side impacts by specifying "strength requirements for side doors, limiting the forces, deflections and accelerations measured on anthropomorphic dummies in test crashes, and by other means." 49 C.F.R. § 571.214; *see also* 72 Fed. Reg. 51908 (addressing side impact protection for sideways crashes into "narrow fixed objects like utility poles and trees."). Here, Plaintiff's claim is that the design of the vehicle was unreasonably dangerous, not that the vehicle failed to meet side impact crashworthy tests. Thus, FMVSS 208, not FMVSS 214, applies to the instant action. *See Ellison*, 650 F. Supp. 2d at 1303 (finding that FMVSS 208, not 214, applies to plaintiff's action alleged defective design for failure to equip vehicle with side airbag).

In sum, this Court concludes that Plaintiff's claims are not preempted by federal law. Accordingly, that portion of Avis' motion seeking summary judgment on preemption grounds is denied.

## II.    Strict Liability

Avis argues that Plaintiff is barred from pursuing his strict liability claims based on the terms of the April 24, 2009 Settlement Agreement. The Settlement Agreement entered into by Plaintiff and GM, provides, in part,

> WHEREAS, RELEASOR[7] expressly represents that any remaining legal claims he may possess as a result of the Incident are asserted solely against PV Holding

[7] "Releasor" refers to Plaintiff.

Corporation, AESOP Leasing, L.P., Cendent Car Rental Group and Avis Rent-A-Car System, Inc. (collectively referred to as "AVIS"). RELEASOR further represents that the legal claims he may possess or will assert against AVIS are based solely on the claim that AVIS was independently negligent for the Incident and/or the injuries RELEASOR sustained in the Incident.

Avis argues that it is has enforceable rights under this agreement as an intended third-party beneficiary.

To succeed on a third-party beneficiary theory under New York law, a non-party must be the intended beneficiary of the contract, not an incidental beneficiary to whom no duty is owed. *Madeira v. Affordable Housing Foundation, Inc.*, 469 F.3d 219, 252 (2d Cir. 2006). "A party asserting rights as a third-party beneficiary must establish '(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost.'" *State of California Public Employees' Retirement System v. Shearman & Sterling*, 95 N.Y.2d 427, 435 (2000) (quoting *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 336 (1983)); *see also Strauss v. Belle Realty Co.*, 98 A.D.2d 424, (2d Dep't 1983) ("A party, claiming to be a third-party beneficiary, has the burden of demonstrating that he has an enforceable right.").

New York follows the Restatement (Second) of Contracts § 302 in allowing a third party to enforce a contract if that third party is an intended beneficiary of the contract. *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 600 (2d Cir. 1991). Section 302(1) provides:

> Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

13

In determining whether a third-party beneficiary exists, courts look at the surrounding circumstances as well as the agreement. *Septembertide Publishing, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 679 (2d Cir. 1989). "The best evidence, however, of whether the contracting parties intended a benefit to accrue to a third party can be ascertained from the words of the contract itself." *Alicia v. City of New York*, 145 A.D.2d 315, 318 (1st Dep't 1988). Nonetheless, "it is well-settled that the obligation to perform to the third party beneficiary need not be expressly stated in the contract." *Trans-Orient Marine Corp v. Star Trading & Marine, Inc.*, 925 F.2d 566, 573 (2d Cir. 1991). "An intent to benefit a third party can . . . be found when no one other than the third party can recover if the promisor breaches the contract . . . or . . . the language of the contract otherwise clearly evidences an intent to permit enforcement by the third party." *Alicia*, 145 A.D.2d at 318.

In this case, neither party disputes the existence of a valid contract, i.e., the Settlement Agreement. *See Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999) ("Settlement agreements are contracts and must therefore be construed according to general principles of contract law."). In sum and substance, the Settlement Agreement releases GM from all liability arising out of the May 21, 2005 accident in exchange for monetary consideration.

Avis argues that pursuant to the plain language of the Settlement Agreement, Plaintiff may "proceed against Avis only on those claims for which Avis is 'independently negligent' – that is, his negligence claim, not a strict liability claim." Def. Memo at 5. Avis further argues that GM plainly intended that Plaintiff be barred from proceeding in strict liability because otherwise, its settlement with Plaintiff would not fully release GM from liability, since Avis could seek indemnification from GM.

14

To understand Defendants' argument, a brief discussion of the theories underlying strict liability and negligence is necessary. In a strict products liability action, "a manufacturer, wholesaler, distributor, or retailer who sells a product in a defective condition is liable for injury which results from the use of the product 'regardless of privity, foreseeability or the exercise of due care.'" *Godoy v. Abamaster of Miami, Inc.*, 302 A.D.2d 57 (2d Dep't 2003). The imposition of strict liability on certain sellers, such as retailers and distributors of allegedly defective products is based on the policy that "[w]here products are sold in the normal course of business, sellers, by reason of their continuing relationships with manufacturers, are most often in a position to exert pressure for the improved safety of products and can recover increased costs within their commercial dealings, or through contribution or indemnification in litigation." *Sukljian v. Charles Ross & Son Co., Inc.*, 69 N.Y.2d 89, 97 (1986). Thus, in a strict liability action, "a seller or distributor of a defective product has an implied right of indemnification as against the manufacturer of the product." *Godoy*, 302 A.D.2d at 62.

On the other hand, in a negligence action, plaintiff must additionally prove that the defendant could have foreseen the injury and, therefore, acted unreasonably in designing the product. *Mustafa v. Halkin Tool, Ltd.*, 00-CV-4851, 2007 WL 959704, at * 10 (E.D.N.Y. Mar. 29, 2007) (citations omitted). In the negligence context, the focus therefore shifts from the characteristics of the product itself to the conduct of the defendant. *Voss v. Black & Decker Mfrs. Co.*, 59 N.Y.2d 102, 107 (1983).

Based on these theories, as well as the express language of the Settlement Agreement, the Court finds that GM necessarily intended that Plaintiff be barred from proceeding against Avis on a theory of strict liability because otherwise, Avis could ultimately seek indemnification from

GM.[8] *See Barnum v. Millbrook Care Limited Partnership*, 850 F. Supp 1227, 1234 (S.D.N.Y. 1994) (the intent of the promisee governs whether the third-party beneficiary is entitled to the benefits of the agreement). In reaching this conclusion, the Court is persuaded by the reasoning in *Spanierman Gallery v. Merritt*, 00 Civ. 5712, 2004 WL 1781006 (S.D.N.Y. Aug. 10, 2004).

In that case, Spanierman Gallery ("Spanierman") brought a declaratory judgment action against Mary Merritt claiming to be the rightful titleholder of a valuable painting. Merritt, the original owner of the painting, had given the painting to Timothy Fagan, a local arts and antiques dealer, who later resold it to Spanierman. Merritt claimed that she had given the painting to Fagan for the limited purpose of having it appraised while Spanierman argued that Merritt sold the painting to Fagan.

In an attempt to resolve this dispute, Merritt and Fagan entered into a settlement agreement, whereby Merritt would release Fagan from all claims and would not pursue claims against any third-party in consideration of $40,000. After analyzing the language of the settlement agreement, as well as the surrounding circumstances, the court concluded that Spanierman was an intended-third party beneficiary of the agreement. The Court stated,

> it is apparent that the general release provision was intended to eliminate Fagan's potential liability to the subsequent purchaser, by eliminating the possibility of Merritt pursuing claims against the subsequent purchaser. Thus, it is abundantly

---

[8] Plaintiff argues that the Settlement Agreement was not intended to eliminate GM's potential liability to Avis because GM is insulated from liability as a matter of law. Relying on *Scarangella v. Thomas Built Buses, Inc.*, 93 N.Y. 2d 655 (1999), Plaintiff states that GM is shielded from liability because Avis opted to purchase the Trailblazer without a side curtain airbag. *See Id.* at 661 (holding that a manufacturer is excused from liability where a sophisticated buyer purchases a product without optional safety equipment). This argument, however, is unpersuasive because under *Scarangella*, GM would still have to show that (1) Avis is thoroughly knowledgeable regarding the product and its use and is actually aware that the safety feature is available; (2) there exist normal circumstances of use in which the product is not unreasonably dangerous without the optional equipment; and (3) Avis is in a position, given the range of uses of the product, to balance the benefits and the risks of not having the safety device in the specifically contemplated circumstances of Avis' use of the product. *Id.*; *see also Mustafa*, 2007 WL 959704 at *13 (stating "defendant has the initial burden of establishing that all three *Scarangella* factors are satisfied."). However, nothing in the record suggests that GM contemplated this defense when entering into the Settlement Agreement.

clear that Merritt and Fagan intended that Merritt would be bound by the general release provision with respect to whatever claims she might have brought against the painting's purchaser. That Fagan would also benefit from this general release does not militate against the conclusion that Merritt undertook an obligation to the third party purchaser.

*Spanierman Gallery*, 2004 WL 1781006, at *12.

Similarly, the Settlement Agreement in this action expressly provides that Plaintiff can only proceed "on the claim that AVIS was independently negligent." This provision was plainly intended to eliminate GM's potential liability to Avis by preventing Plaintiff, in consideration of a large sum of money, from pursuing claims in strict liability against Avis. Thus, it is clear from the terms of the Settlement Agreement and the surrounding circumstances that Avis is an intended third-party beneficiary, and, as such, it is entitled to enforce its terms.[9] Accordingly, Plaintiff's claims sounding in strict liability are dismissed.

## III. Negligence

To establish a claim for negligence under New York law, Plaintiff must demonstrate that (1) Avis owed him a duty; (2) Avis breached that duty; and (3) Avis' breach was the proximate cause of his injury.[10] *See Akins v. Glens Falls City School Dist.*, 53 N.Y.2d 325 (1981). Here, Plaintiff argues that Avis was negligent by failing to order the Trailblazer with a side curtain

---

[9] The Court notes that in *Spanierman*, factual questions surrounding the language and execution of the agreement precluded a finding that Merritt had waived her claims against Spanierman. This problem is not present in the instant case; therefore, Avis is entitled to enforce the terms of the Settlement Agreement.

[10] In an action alleging negligent design, Plaintiff bears the burden of presenting evidence that "(1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing plaintiff's injury." *Ramos v. Simon-Ro Corp.*, No. 06-CV-6105, 2008 WL 4210487, at *8 (S.D.N.Y. Sept. 11, 2008). In determining the risk/utility of the product, New York law "demands an inquiry into such factors as (1) the product's utility to the public as a whole, (2) its utility to the individual user, (3) the likelihood that the product will cause injury, (4) the availability of a safer design, (5) the possibility of designing and manufacturing the product so that it is safer but remains functional and reasonably priced, (6) the degree of awareness of the product's potential danger that can reasonably be attributed to the injured user, and (7) the manufacturer's ability to spread the cost of any safety-related design changes." *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 256 (1995). Here, Plaintiff submits several expert affidavits which state the 2005 Trailblazer was defectively designed. Avis does not contest these statements. Rather, Avis contends that it did not own Plaintiff a duty to equip the Trailblazer with optional safety equipment.

airbag and subsequently renting this defectively designed vehicle. Pl. Third Supp. Resp. to Avis'

First Set of Interrogs. ("Pl. Interrog. Resp.") ¶ 10. Avis responds that it had no duty to equip the

Trailblazer with optional safety equipment, and that its failure to do so cannot give rise to a cause

of action sounding in negligence. *See* Def. Reply at 12 (stating, "[t]he issue is *not* whether Avis

breached a duty of care, and Avis does not seek to be "excused" from its duty; rather . . . Avis did

not have the duty claimed by Plaintiff.").

Upon review of the parties' submissions and the relevant case law, this Court concludes

that in some circumstances, a car rental agency has a duty to equip and lease its vehicles with

optional safety equipment. However, this case is not one of them.

"[A] determination of negligence--i.e., breach of duty--must begin with consideration of

the duty owed, which is a matter of policy, rather than with the issue of foreseeability." *Sukljian

v. Charles Ross & Son Co., Inc.*, 69 N.Y.2d 89, 97 (1986). In general, "[m]anufacturers and

sellers in the normal course of business are liable for injuries caused by ordinary negligence, and

are therefore under a duty to exercise reasonable care so as to avoid the occurrence of injuries by

any product which can reasonably be expected to be dangerous if negligently manufactured or

sold." *Gebo v. Black Clawson Co.*, 92 N.Y.2d 387, 394 (1998). "It is a duty to use the care, skill,

and diligence in and about the process of manufacturing and preparing for market that a

reasonable, skillful, and diligent person, or a reasonably prudent person would use under the

same or parallel circumstances." 86 N.Y. Jur. 2d, Products Liability § 39. "Proof of a generally

accepted practice, custom or usage within a particular trade or industry is admissible as tending

to establish a standard of care, and proof of a departure from that general custom or usage may

constitute evidence of negligence." *Cruz v. New York City Transit Auth.*, 136 A.D.2d 196, 199

(2d Dep't. 1988).

18

Under New York law, "[a] retailer is not generally liable in negligence for the sale of a defective product." *Gonzalez v. Rutherford Corp.*, 881 F. Supp. 829, 844 (E.D.N.Y. 1995). However, "it is under a duty to inspect for and discover such defects 'as a reasonable physical inspection would disclose.'" *Gonzalez*, 881 F. Supp. at 844 (E.D.N.Y. 1995) (quoting *Naples v. City of New York*, 34 A.D.2d 577, 578 (2d Dep't 1970)). Thus, "[a] retailer need not ordinarily inspect merchandise for latent defects . . . [and] when a defect is discoverable only by special tests or by an expert's examination, a retailer will generally not be liable for failure to discover." *Topliff v. Wal-Mart stores East LP*, No. 6:04-CV-0297, 2007 WL 911891, at *44 (N.D.N.Y. Mar. 22, 2007) (quoting 6-232 *Warren's Negligence in the New York Courts* § 232.02[2][e] (Matthew Bender 2005)); *see also Travelers Indem. Co. of Illinois v. Hunter Fan Co., Inc.*, No. 99 CIV 4863, 2002 WL 109567, at *7 (S.D.N.Y. Jan. 28, 2002) ("retailer cannot be held liable for injuries sustained from the contents of a sealed product even though a testimony have uncovered a potential danger; no such obligation is imposed on a retailer."). This duty is heightened for dealers in used products, *Gonzalez v. Rutherford Corp.*, 881 F. Supp. at 844 (question of fact exists as to whether used product dealer conducted a reasonable physical inspection and whether it acted reasonably in failing to install safety devices), and for vendors who buy "goods from an unknown manufacturer or one of dubious reputation," *Krumpek v. Millfeld Trading Co.*, 272 A.D.2d 879, 880 (4th Dep't 2000), because they have no reasonable grounds for believing that the product they acquire and offer for resale is free from dangerous defects. *Id.*

In contrast, "[a] vendor who purchases products from a reputable source of supply has reasonable grounds for believing the products to be free from defects." *Krumpek*, 272 A.D.2d 880. In the motor vehicle industry specifically, "[a] dealer in new motor vehicles manufactured by a manufacturer of national reputation is not under a duty to inspect such a vehicle to discover

latent defects, nor is the dealer liable for an injury resulting from such a defect which was unknown to the dealer." 86 N.Y. Jur. 2d, Products Liability § 128; *see also Morrissey v. Mazzio*, 249 A.D. 788 (2d Dep't 1936).

Applying the above principles to the instant case, Avis, which purchased the Trailblazer from GM, a reputable manufacturer, had reasonable grounds to believe the Trailblazer to be free from defects. No reasonable inspection by Avis would have or could have discovered the Trailblazer's potentially defective design, i.e., the absence of a side curtain airbag. Therefore, Avis cannot be held liable in negligence for failing to discover this alleged design defect and subsequently renting the Trailblazer in this condition.

Plaintiff argues that Avis knew or should have known that the Trailblazer was defectively designed. Specifically, Plaintiff states that:

> Avis was responsible for selecting the features to be included with the GM Trailblazer it leased/rented to its customers. Avis failed to order and have included rollover curtain air bags which would have significantly added to the crash safety performance of the Trailblazer. Avis was aware or should have been aware of this safety feature, and its significant value for vehicles like the Trailblazer, which, as an SUV, has a significantly higher risk of rollover than other product lines Avis purchased from General Motors Corporation. The failure to order and have installed this crash safety component caused Avis to rent/lease/market a defective and unreasonably dangerous product.

Pl. Interrog. Resp. ¶ 10. As evidence, Plaintiff submits a January 9, 2001 NHTSA report awarding the 4x2 Chevrolet Blazer with a one-star rollover resistance rating, and the 4x4 Chevrolet Blazer with a two-star rollover resistance rating, out of a possible five-stars. Pl. Ex. E. Plaintiff also proffers a January 10, 2001 Daily News article reflecting these poor rollover resistance ratings. Pl. Ex. F.

However, Plaintiff's citations to a report for "Model Year 2001 Rollover Resistance Ratings" and a single news article from 2001 are insufficient to establish that the *2005*

Trailblazer also had a low rollover resistance rating. Moreover, nothing in the record suggests that Avis knew about these ratings, and according to Avis, it does not generate, maintain, or receive documents with respect to rollovers involving its SUVs. Entenberg Aff. ¶¶ 2, 3. Additionally, there no evidence in the record that Avis had any information from which it could analyze the safety value of side curtain airbags,[11] and any knowledge that it did have regarding the availability of side curtain airbags, by itself, is insufficient to establish an inference that the Trailblazer was defective. *See, e.g., Marchant v. Mitchell Dist. Co.*, 270 S.C. 29, 35-36 (1977) ("[w]e think however, that the fact the crane was without the optional safety device, does not tend to prove that it was defective.").

Plaintiff relies substantially on several expert affidavits stating that Avis had a duty to research and understand the safety risks of its vehicles, and therefore Avis' failure to equip the Trailblazer with a side curtain airbag, which rendered it defective, constitutes negligence. The following selected excerpts are taken from the affidavit of David A. Stivers, a consulting expert in motor vehicle industry standards and practices:

> 8. Companies that acquire fleets are obligated by custom and practice to be well informed about the features and limitations of the products purchased. From both a financial planning standpoint and from a consumer safety standpoint, fleet operators have a responsibility to keep apprised of a whole host of issues that cannot be obtained from the manufacturer, such as the usages to which these products are made by rental/lease customers, including the variations in driving techniques based on the category of vehicles, the types of accidents that arise, the frequency of accidents, the characteristics of accidents due to vehicle usage, the types of injuries that arise annually, demographics, etc.

> 9. Companies like Avis, that acquire several hundred thousand vehicles during each purchase period, have a responsibility to know what features are available with each product line and to determine based upon consumer and safety interests

---

[11] The record reflects that Avis possessed an Order Guide listing the available options for each vehicle purchased and requested GM's 2005 model year safety equipment. The Order Guide does not include expert reports, research or other data about the safety value of a side curtain airbag, and Avis explains that it requested the model year safety equipment in response to inquiries from corporate clients.

what preferences should be given to available purchasing packages and options. This responsibility extends to educating themselves of the value of each so-called safety option that can be acquired with each fleet vehicle model . . .

10. The decision to acquire optional features with fleet vehicles cannot be left to chance or the recommendation of the manufacturer. The fleet purchaser understands that the manufacturer's proposals regarding standard and optional equipment offered to the purchaser is predicated upon the purchaser's interest in maximizing its profitability and it may not be the most appropriate indicator of what features should be ordered.

11. I have researched and determined that as of 2001, the federal government announced that the Chevrolet Trail Blazer, one of the primary sports utility models offered by Avis for a number of years, was rated as having the highest risk of rollover of any SUV on the road. That information should have been known to Avis. That information required that Avis' employees study the standard and safety options available for the Trail Blazer in subsequent years to address the inherent risks associated with the rental of this model vehicle.

13. It is my opinion that Avis was duty-bound to research and determine the safety importance of the optional equipment available for the Trail Blazer, and then make a decision regarding the need for rollover safety equipment given the publically available information about the risk of rollover of this model SUV."

Stivers Aff. ¶¶ 8-11, 13. Similarly, Alan Cantor, a former researcher in vehicle testing and development, attests:

7. It is my opinion that given the publicly available accident history of Blazer/Trailblazer in rollovers, this SUV should have been equipped with a "rollover curtain." And the failure to equip this vehicle with a rollover curtain rendered it unsafe/defective. It is further my opinion that it was a breach of public safety to market this SUV to renters without equipping it with this critical piece of available safety equipment.

Cantor Aff. ¶ 7.

Pursuant to Fed. R. Civ. P. 56(e), "[a] supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e). "An affidavit stating the facts upon which the expert's opinion is based satisfies rule 56(e) even if the data supporting the facts is not attached." *Iacobelli Construction, Inc. v. County of Monroe*, 32 F.3d 19, 25 (2d Cir.

1994); *see also Mid-State Fertilizer Co v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333 (7th Cir. 1989) (rejecting an economist's affidavit as conclusory because it provided no background information or an underlying factual basis). However, "[w]here an expert's affidavit is vague, conclusory and factually unsupported, it fails to raise an issue of fact." *Skidd v. JW Marriot Hotels & Resorts*, No. 06 Civ. 1554, 2010 WL 2834890, at *5 (S.D.N.Y. July 8, 2010) (internal quotations omitted). Additionally, under Fed. R. Evid. 702, the Court must also determine whether the proposed witness is qualified to testify as an expert, and if qualified, whether scientific, technical, or other specialized testimony provided by that expert is both relevant and reliable.[12] *Delehanty v. KLI, Inc.*, 663 F. Supp. 2d 127, 131 (E.D.N.Y. 2009).

Here, nothing in Plaintiff's submissions establishes Stivers' and Cantor's expertise in the car rental industry. *See Nisanov v. Black & Decker (U.S.) Inc.*, No. 05 Civ. 5911, 2008 WL 906708, at *3 (E.D.N.Y. Apr. 3, 2008) (the expert must have relevant experience and qualifications such that whatever opinion he or she will ultimately express would not necessarily be speculative). Stivers' experience arises from work in car dealership and multi-dealership management industries. Pl. Ex. I. On his resume, the automobile industry schools and seminars he attended include *manufacturing* companies such as General Motors Corporation, Ford Motor Company, Chrysler Corporation, and Toyota Motor Sales. However, there is no indication that Stivers possesses experience or expertise, or was trained, in the car rental agency industry for companies such as Avis.[13] Likewise, Cantor, who has worked in vehicle research and safety

---

[12] Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Civ. P. 702.

[13] The Court notes that, unlike car rental agencies, car dealerships are commonly affiliated with the manufacturer. Consequently, they are often responsible for repairs, recalls, maintenance, etc.

development, has no experience in the car rental agency industry. Accordingly, neither of these purported experts is qualified to testify about the customs and standards in the car rental agency. *See Zaremba v. General Motors Corp.*, 360 F.3d 355 (2d Cir. 2004) (finding proposed expert's qualifications "meager.").

Most important, Stivers offers no facts or evidence to support his statement regarding customs and practices in the car rental agency market, and neither expert provides any foundation for their opinion that Avis had a duty to research and determine the safety features of the 2005 Trailblazer and to equip it with a side curtain airbag. *See Mid-State Fertilizer Co.*, 877 F.2d at 1339 ("an expert's declaration, full of assertion but empty of facts and reasons, won't get a case past a motion for summary judgment, for a judge must look behind [the expert's] ultimate conclusion . . . and analyze the adequacy of its foundation.") (citing *Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823, 829-32 (D.C. Cir. 1988)) (internal quotations omitted). In sum, the conclusory statements proffered by Plaintiff's experts are insufficient to withstand Avis' summary judgment motion. *See In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 187, 193 (2d Cir. 1987) (issues of fact at the summary judgment stage "cannot be established by mere speculation or idiosyncratic opinion, even if that opinion is held by one who qualifies as an expert").

Here, it is beyond dispute that Avis has no involvement with the design, assembly or testing of the vehicles it purchases from GM, including the 2005Trailblazer. Nothing in the record suggests that Avis knew or should have known that the 2005 Trailblazer was unreasonably dangerous, and Plaintiff has failed to present sufficient evidence that the alleged defect was discoverable through reasonable physical inspection.[14] *See Topliff*, 2007 WL 911891, at *44 ("it

---

[14] In *Durham v. County of Maui*, CIV. No. 08-00342, 2010 WL 234875, at *6 (D. Hawai'i Jan. 21, 2010), the Court, relying on an expert report, concluded that a question of fact existed as to whether the car rental agency should have

24

is Plaintiff's duty, as a threshold matter, to adduce some evidence that the alleged defect was patent or discoverable through reasonable physical inspection."). Accordingly, no reasonable factfinder could conclude that Avis, which purchased vehicles from GM, a reputable manufacturer, was negligent in failing to equip the Trailblazer with an optional side curtain airbag. Accordingly, Plaintiff's negligence claim against Avis must be dismissed.

## IV. Negligent Misrepresentation

Avis moves for summary judgment on Plaintiff's claim that it negligently misrepresented that the Trailblazer was safe. Pl. Dep. at 59. To recover on a theory of negligent misrepresentation, Plaintiff must establish that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000). Generally, "liability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." *Kimmell v. Schaefer*, 89 N.Y.2d 257, 264 (1996). Additionally, otherwise casual statements, even if made in a commercial setting, are not actionable. *Id.* at 263.

As previously stated, Avis had no reason to know that the Trailblazer was potentially defective and, therefore, unsafe. Likewise, there is no evidence that the Avis rental agent at La

---

investigated and determined that the vehicle it had leased to plaintiff, which did not include a side airbag, was unsafe. This Court declines to follow *Durham* because in this Court's judgment, no reasonable inspection by Avis could have discovered the alleged design defect that results when a Trailblazer is not equipped with an optional side curtain airbag.

Guardia Airport, who Plaintiff has not identified, knew or should have known that the Trailblazer was unsafe. Moreover, any alleged statement made by the rental agent that the Trailblazer was "safe" amounts to no more than a casual response, and any reliance upon this statement by Plaintiff was not reasonable. Accordingly, Plaintiff's claim that Avis negligently misrepresentation claim is dismissed.

## CONCLUSION

For the abovementioned reasons, Avis' motion for partial summary judgment is GRANTED as to Plaintiff's strict liability and negligence claims. The Court notes, however, that Avis did not move for summary judgment with respect to Plaintiff's breach of express and implied warranty claims. Therefore, by October 1, 2010, Avis is directed to serve and file a letter providing the Court with a status report on the case as a whole, and specifically addressing the status of these outstanding claims. Plaintiff's response shall be served and filed by October 10, 2010.

SO ORDERED.

Dated: Brooklyn, New York
      September 21, 2010

_____
ROSLYNN R. MAUSKOPF
United States District Judge